ANDREW L. PACKARD (State Bar No. 168690)
MEGAN E. TRUXILLO (State Bar No. 275746)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
Email: Andrew@packardlawoffices.com

FREDRIC EVENSON (State Bar No. 198059)
Ecology Law Center
P.O. Box 1000
Santa Cruz, CA 95061
Telephone: (831) 454-8216
Email: Evenson@ecologylaw.com

Attorneys for Plaintiff
ECOLOGICAL RIGHTS FOUNDATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION, a non-profit corporation,<br><br>              Plaintiff,<br><br>      vs.<br><br>PENINSULA CORRIDOR JOINT POWERS BOARD and TRANSIT AMERICA SERVICES, INC.,<br><br>              Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387)** |

ECOLOGICAL RIGHTS FOUNDATION ("EcoRights" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.       JURISDICTION AND VENUE

1.       This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the "CWA" or "the Act") against the PENINSULA CORRIDOR JOINT POWERS BOARD and

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

TRANSIT AMERICA SERVICES, INC. (collectively referred to as "Defendants").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C. §1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.       On or about May 13, 2015, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("CWA Notice Letter"), and of their intention to file suit against Defendants, as required by the Act. *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991).  Plaintiff mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Regional Water Quality Control Board, Central Coast Region ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1) (1991).  A true and correct copy of EcoRights' CWA Notice Letter is attached hereto as Exhibit A, and is incorporated by reference.

3.       More than sixty days have passed since Plaintiff served this CWA Notice Letter on Defendants and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.       Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

1    Defendants do business in this District and a substantial part of the events or omissions

2    giving rise to Plaintiff's claims occurred in this District.  Intra-district venue is proper in San

3    Jose, California, because the sources of the violations are located within Santa Clara County.

4    **II.    INTRODUCTION**

5         5.        This Complaint seeks relief for Defendants' violations of the CWA at the

6    approximately 4-acre rail service facility owned and/or operated by Defendants (the

7    "Facility").  The Facility is located at 7150/7250 Monterey Road, in Gilroy, California.

8    Plaintiff is informed and believes, and thereupon alleges, that Defendants discharge

9    pollutant-contaminated storm water from the Facility into the City of Gilroy's Municipal

10   Separate Storm Sewer System, which conveys that water into Llagas Creek, which flows into

11   the Pajaro River, and ultimately Monterey Bay.  Plaintiff is informed and believes, and

12   thereupon alleges, that Defendants are in violation of both the substantive and procedural

13   requirements of the CWA.   Defendants deny these allegations.

14        6.        Plaintiff is informed and believes, and thereupon alleges, that Defendants'

15   discharge of pollutant-contaminated storm water from the Facility is in violation of the Act

16   and the State of California's General Industrial Permit for storm water discharges, State

17   Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as

18   amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ,

19   and Water Quality Order No. 2014-0057-DWQ, National Pollutant Discharge Elimination

20   System ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or

21   "Permit").  Plaintiff is informed and believes, and thereupon alleges, that Defendants'

22   violations of the filing, monitoring, reporting, discharge and management practice

23   requirements, and other procedural and substantive requirements of the General Permit and

24   the Act are ongoing and continuous.  Defendants deny these allegations.

25        7.        The failure on the part of industrial facility operators to comply with the

26   General Permit is recognized as a significant cause of the continuing decline in water quality

27   of receiving waters, such as Llagas Creek, the Pajaro River, and the Monterey Bay.  The

28   general consensus among regulatory agencies and water quality specialists is that storm

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

water pollution amounts to more than half the total pollution entering the marine environment each year.  With every rainfall event, hundreds of thousands of gallons of polluted storm water originating from industrial facilities discharge to Llagas Creek, the Pajaro River, and the Monterey Bay

## III.    PARTIES

8.      Plaintiff EcoRights is a non-profit public benefit corporation organized under the laws of California, with its main office in Garberville, California.  EcoRights' purpose is to educate the public about environmental practices which cause harm to human health, the environment and other natural resources, and to seek redress from those harms through litigation or alternative dispute resolution.  EcoRights represents citizens in protecting California's waterways from pollution, securing the multitude of benefits that flow from clean, vibrant waters: safe drinking water, abundant and diverse wildlife populations, healthy recreational opportunities, and economic prosperity from commercial fishing, tourism, and other commercial activities that depend on clean water. To further its goals, EcoRights actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

9.      Members of EcoRights, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate near Llagas Creek, the Pajaro River, and the Monterey Bay (hereinafter collectively referred to as "impacted waters"), into which Defendants cause pollutants to be discharged.  These EcoRights members use and enjoy the impacted waters for recreational, educational, scientific, conservation, aesthetic, and spiritual purposes.  Defendants' alleged discharge of storm water containing pollutants impairs each of those uses. Thus, the interests of EcoRights' members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the General Permit.

10.      Members of EcoRights reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of EcoRights use and enjoy the

Complaint For Declarative and
Injunctive Relief and Civil Penalties

1  waters of Llagas Creek, the Pajaro River, and the Monterey Bay, into which Defendants have

2  caused, are causing, and will continue to cause, pollutants to be discharged.  Members of

3  EcoRights use these areas to fish, sail, boat, kayak, swim, bird watch, view wildlife, and

4  engage in scientific study, including monitoring activities, among other things.  Defendants'

5  discharges of pollutants threaten or impair each of those uses or contribute to such threats

6  and impairments.  Thus, the interests of EcoRights' members have been, are being, and will

7  continue to be adversely affected by Defendants' ongoing failure to comply with the Clean

8  Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendants'

9  activities.

10  11.  Continuing commission of the acts and omissions alleged above would

11  irreparably harm Plaintiff and the citizens of the State of California, for which harm they have

12  no plain, speedy or adequate remedy at law.

13  12.  Plaintiff is informed and believes, and thereupon alleges that Defendants

14  PENINSULA CORRIDOR JOINT POWERS BOARD and TRANSIT AMERICA

15  SERVICES, INC. own and/or operate the Facility.

16  **IV.    LEGAL BACKGROUND**

17  **A.    Clean Water Act**

18  13.  Congress enacted the CWA to "restore and maintain the chemical, physical,

19  and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).   The CWA

20  establishes an "interim goal of water quality which provides for the protection and

21  propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . .

22  ."  33 U.S.C. § 1251(a)(2).  To these ends, Congress developed both a water quality-based

23  and technology-based approach to regulating discharges of pollutants from point sources into

24  waters of the United States.

25  14.  Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

26  pollutant from a point source into waters of the United States, unless such discharge is in

27  compliance with various enumerated sections of the Act.  Among other things, Section

28  301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

15.     The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

16.     A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

17.     "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).  Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters. 40 C.F.R. § 230.3 (2015).

18.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. §1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity.  *Id.* § 1342(p)(2)(B).

19.     Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* §1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

20.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4 (2008).

**B.     State Regulations**

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

21.     The Pajaro River and Llagas Creek are heavily degraded from pollutant loading.  This is officially recognized by the EPA, the State Board and the Regional Board, which have placed both waterbodies on the CWA section 303(d) list of waters that they do not meet applicable water quality standards. The Regional Board's Basin Plan is the master policy document setting forth the legal, technical, and programmatic bases of water quality regulation in the Region.  Among other things, the Basin Plan includes the water quality objectives needed to protect the designated beneficial water uses.  The Basin Plan sets forth narrative water quality objectives for sediment, settleable and suspended materials, as well as narrative objectives for not impairing water quality with oil sheens, turbidity, or other nuisance conditions.  The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen and toxic pollutants as well as site specific objectives for certain pollutants of concern such as copper, lead and zinc.

22.     The Pajaro River is listed on the section 303(d) list as impaired for boron, chlordane, chloride, chlorpyrifos, dichlorodiphenyldichloroethane, dieldrin, *E. Coli*, fecal coliform, low dissolved oxygen, sedimentation/siltation, nitrate, nutrients, polychlorinated biphenyls, pH, sedimentation/siltation sodium and turbidity.

23.     Llagas Creek is also listed on the section 303(d) list as impaired for chloride, chlorpyrifos, electrical conductivity, *E. Coli*, fecal coliform, low dissolved oxygen, sedimentation/siltation, nutrients, turbidity, sodium and total dissolved solids.

24.     In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR"), discussed further below, sets Water Quality Standards ("WQS") for 126 toxic priority pollutants in California's rivers, lakes, enclosed bays, and estuaries. The CTR, which applies to Llagas Creek and the Pajaro River, and includes limits for several toxic metals.

**C.     California Industrial Storm Water General Permit**

25.     Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

26.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

27.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

28.     Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI"). The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

29.     Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit.  A violation of the General Permit is a violation of the Act. *See* General Permit, Section XXI.A.

30.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

31.     The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

32.     Discharge Prohibition III.B of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States. Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution,

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

1  contamination or nuisance as defined in section 13050 of the California Water Code.

2  Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges

3  that cause or contribute to an exceedance of any applicable water quality standards in any

4  affected receiving water.  Receiving Water Limitation VI.B of the General Permit prohibits

5  storm water discharges to any surface or ground water that adversely impact human health or

6  the environment.

7       33.     Effluent Limitation V.A of the General Permit requires dischargers to reduce

8  or prevent pollutants in their storm water discharges through implementation of the Best

9  Available Technology Economically Achievable ("BAT") for toxic and nonconventional

10  pollutants and the Best Conventional Pollutant Control Technology ("BCT") for

11  conventional pollutants.

12       34.     EPA has established Benchmark Levels as guidelines for determining

13  whether a facility discharging industrial storm water has implemented the requisite BAT and

14  BCT standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks

15  have been established for pollutants discharged by Defendants: Total Suspended Solids –

16  100 mg/L; Zinc – 0.117 mg/L; Copper – 0.0636 mg/L; and Lead – 0.0816 mg/L.

17       35.     The Regional Board has established water quality standards for Llagas

18  Creek, the Pajaro River and the Monterey Bay in the Water Quality Control Plan for the

19  Central Coast Basin, generally referred to as the "Basin Plan."

20       36.     The Basin Plan includes a toxicity standard which states that "[a]ll waters

21  shall be maintained free of toxic substances in concentrations which are toxic to or which

22  produce detrimental physiological responses in, human, plant, animal, or aquatic life."

23       37.     The Basin Plan provides that "[w]aters shall not contain concentrations of

24  chemical constituents known to be deleterious to fish or wildlife."

25       38.     The Basin Plan provides that "[a]t a minimum, water designated for use as

26  domestic or municipal supply (MUN) shall not contain concentrations of chemical

27  constituents in excess of the maximum contaminant levels (MCLs)."

28       39.     EPA issued the CTR in 2000, establishing numeric receiving water limits for

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

certain toxic pollutants in California surface waters.  40 C.F.R. § 131.38 (2013).  The CTR establishes the following numeric limits for freshwater surface waters:  arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L; chromium (III) – 0.550 mg/L (maximum concentration); copper – 0.013 mg/L (maximum concentration); and lead – 0.065 mg/L (maximum concentration), subject to water hardness.

40.     The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

41.     Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year.  General Permit, Section X.B.

42.     Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice.  General Permit, Section X.H.2.

43.     Special Conditions Section XX.B of the General Permit requires a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of Receiving Water Limitations, Section VI.  The documentation must describe changes the discharger will make to its current BMPs in order

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit, Section XX.B.

44.     Section XV of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

45.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Section IV of the General Permit unless authorized by another NPDES permit.  General Permit, Section III. B.

46.     The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  General Permit, Section X.I.2. Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.  Dischargers must also collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and other pollutants likely to be in the storm water discharged from the facility base on the pollutant source assessment.  General Permit, Section XI.B.6.

47.     Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11. Sampling results must be compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of the General Permit.  General Permit, Section XII.  An annual NAL exceedance occurs when the average of the results for a parameter for all samples taken

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

within a reporting year exceeds the annual NAL value.  General Permit, Section XII.A.1.  An instantaneous NAL exceedance occurs when two (2) or more results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value.  General Permit, Section XII.A.2.  If a discharger has an NAL exceedance during a reporting year, the discharger's status changes to Level 1 status under the General Permit and the discharger must comply with the requirements set forth for Level 1 status operators set forth at Section XII.C.  The discharger's status shall change to Level 2 status if sampling results indicated an NAL exceedance for a parameter while the discharger is in Level 1 status.  If a discharger becomes Level 2 status it must comply with the obligations set forth at Section XII.D.

48.     Dischargers must submit an Annual Report no later than July 15th following each reporting year certifying compliance with the Permit and/or an explanation for any non-compliance.  General Permit, Section XVI.

V.     **STATEMENT OF FACTS**

49.     The Facility is classified as conforming to Standard Industrial Classification ("SIC") Code 4111 ("Passenger Rail Service").  Industrial activities occur throughout the Facility.  EcoRights' investigation into the industrial activities at Defendants' approximately 4-acre facility indicates that the Facility is used to store, service and fuel railcars.

50.     Plaintiff is informed and believes, and thereupon alleges, most of these activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms and other storm water controls.  Plaintiff is informed and believes that Defendants' storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

51.     Plaintiff is informed and believes, and thereupon alleges:  The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT standards.  The Facility lacks essential structural controls such as grading, berming and roofing to prevent rainfall and storm water flows from coming into

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

contact with these and other sources of contaminants, thereby allowing storm water to flow over and across these materials and become contaminated prior to leaving the Facility. In addition, the Facility lacks structural controls to prevent the discharge of water once contaminated. The Facility also lacks an adequate filtration system to treat water once it is contaminated.

52. Plaintiff is informed and believes, and thereupon alleges, that during rain events storm water laden with pollutants discharges from the Facility to the City of Gilroy's Municipal Separate Storm Sewer System, which conveys that water into Llagas Creek, which flows into the Pajaro River, and ultimately the Monterey Bay.

53. Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to these waters during significant rain events.

54. Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.

55. Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

56. Information available to Plaintiff indicates the continued existence of unlawful storm water discharges at the Facility.

57. Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the Facility. Plaintiff is informed and believes, and thereupon alleges, that Defendants have not sampled with adequate frequency, have not conducted visual monitoring, and have not analyzed the storm water samples collected at the Facility for the required pollutant parameters.

58. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

59.     A justiciable controversy exists as Defendants deny and contest the foregoing allegations and maintain that the Facility has been operated in full compliance with the Act and Permit.

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Discharges of Contaminated Storm Water From The Facility
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

60.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

61.     Receiving Water Limitations VI.A and VI.B of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water.  Discharge Prohibition III.C of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.

62.     Plaintiff is informed and believes, and thereupon alleges, that since at least May 13, 2010, Defendants have been discharging polluted storm water from the Facility into Llagas Creek, the Pajaro River and the Monterey Bay in violation of the General Permit.

63.     Plaintiff is informed and believes, and thereupon alleges, that during every significant rain even, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated from the Facility into Llagas Creek, the Pajaro River and the Monterey Bay.

64.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Discharge Prohibition III.C of the General Permit.

65.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.A and VI.B of the General

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

14

Permit.

66.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, and/or the CTR, in violation of Receiving Water Limitation VI.A of the General Permit.

67.     Plaintiff is informed and believes, and thereupon alleges, that every day since May 13, 2010, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit. These violations are ongoing and continuous.

68.     Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since May 13, 2010. *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

69.     A justiciable controversy exists as Defendants deny and contest the foregoing allegations and maintain that the Facility has been operated in full compliance with the Act and Permit.

**SECOND CLAIM FOR RELIEF**
**Failure to Develop and Implement an Adequate**
**Storm Water Pollution Prevention Plan For the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

70.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

71.     Section X of the General Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP prior to commencement of industrial activities.

72.     Plaintiff is informed and believes, and thereupon alleges that Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

by, *inter alia*, Defendants' outdoor storage of industrial materials without appropriate best management practices; the continued exposure of significant quantities of industrial material to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

73.     Plaintiff is informed and believes, and thereupon alleges: Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit; Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility. These violations are ongoing and continuous.

74.     Each day that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since May 13, 2010. *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

75.     A justiciable controversy exists as Defendants deny and contest the foregoing allegations and further maintain that the Facility has been operated in full compliance with the Act and Permit.

### THIRD CLAIM FOR RELIEF
**Failure to Develop and Implement the Best Available
And Best Conventional Treatment Technologies at the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

76.     Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

77.     The General Permit's SWPPP requirements and Effluent Limitation D.32 require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

16

78.     Plaintiff is informed and believes, and thereupon alleges, Defendants have failed to implement BAT and BCT at the Facility for their discharges of Total Suspended Solids, Lead, Copper, Zinc and Specific Conductance and other unmonitored pollutants in violation of Effluent Limitation D.32 of the General Permit.

79.     Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

80.     Plaintiff is informed and believes, and thereupon alleges: Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards.  These violations are ongoing and continuous.

81.     Plaintiff is informed and believes, and thereupon alleges: Plaintiff is informed and believes, and thereupon alleges, Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least May 13, 2010, 2010. Defendants are subject to civil penalties for each and every violation of the Act since May 13, 2010.  *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

82.     A justiciable controversy exists as Plaintiff is informed that Defendants deny and contest the foregoing allegations and maintain that the Facility has been operated in full compliance with the Act and Permit.

### FOURTH CLAIM FOR RELIEF
### Failure to Develop and Implement an Adequate
### Monitoring Implementation Plan for the Facility
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

83.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

84.     Section X.I and Section XI. of the General Permit require dischargers of storm water associated with industrial activity to develop and implement a monitoring implementation plan (including, among other things, sampling and analysis of discharges) prior to commencement of industrial activities.

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

17

85.     Plaintiff is informed and believes, and thereupon alleges that Defendants have failed to develop and implement an adequate monitoring implementation plan for the Facility.  Defendants' ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, their continuing failure to collect and analyze storm water samples from all discharge locations, their continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants, including Oil & Grease – 15.0 mg/L, Nickel – 1.417 mg/L, Magnesium – 0.0636 mg/L, Chemical Oxygen Demand – 120 mg/L, Cadmium – 0.0159 mg/L, Mercury – 0.0024 mg/L, Selenium – 0.2385 mg/L, and Silver – 0.0318 mg/L, as the General Permit requires, and their failure to file required Annual Reports with the Regional Board which provide required documentation and information relating to visual observations and storm water sampling and analysis conducted at the Facility.

86.     Plaintiff is informed and believes, and thereupon alleges, Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility in each day since at least May 13, 2010.  These violations are ongoing and continuous.

87.      Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since May 13, 2010. *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

88.     A justiciable controversy exists as Defendants deny and contest the foregoing allegations and maintain that the Facility has been operated in full compliance with the Act and Permit.

## VII.   **RELIEF REQUESTED**

Wherefore, EcoRights respectfully requests that this Court grant the following relief:

a.  Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from its the Facility in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342 and for failing to comply

Complaint For Declaratory and
Injunctive Relief and Civil Penalties

with all substantive and procedural requirements of the General Permit and the CWA as alleged herein;

        b.  Enjoin Defendants from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility in violation of the Act and the General Permit;

        c.  Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

        d.  Order Defendants to pay civil penalties of $37,500 per day per violation for all violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4 (2008);

        e.  Order Defendants to take appropriate actions to restore the quality of navigable waters impaired by their activities;

        f.  Award Plaintiff's costs and fees (including reasonable attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

        g.  Award any such other and further relief as this Court may deem appropriate.

Dated: March 4, 2016            Respectfully Submitted,

                                   LAW OFFICES OF ANDREW L. PACKARD

                      By:    /s/ Andrew L. Packard

                                   Andrew L. Packard
                                   Attorneys for Plaintiff
                                   ECOLOGICAL RIGHTS FOUNDATION

**EXHIBIT A**

Law Offices Of

# ANDREW L. PACKARD

100 Petaluma Blvd N, Ste 301, Petaluma, CA 94952
Phone (707) 763-7227   Fax (707) 763-9227
Info@PackardLawOffices.com

May 13, 2015

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

| | |
|---|---|
| Dustin L. Davis, Facility Engineer | CT Corporation System |
| Carlos Leon, Manager of Equipment | Agent for Service of Process |
| TransitAmerica Services, Inc. | TransitAmerica Services, Inc. |
| 585 Lenzen Avenue | 818 West Seventh Street, 2nd Floor |
| San Jose, CA 95110 | Los Angeles, CA 90017 |
| | |
| Dustin L. Davis, Facility Engineer | Stephen Chao, |
| Carlos Leon, Manager of Equipment | Deputy Director of Engineering SamTrans |
| TransitAmerica Services, Inc. | Peninsula Corridor Joint Powers Board |
| 7150 Monterey Road | 1250 San Carlos Avenue |
| Gilroy, CA 95020 | San Carlos, CA 94070-1306 |
| | |
| Dustin L. Davis, Facility Engineer | Stephen Chao, |
| Carlos Leon, Manager of Equipment | Deputy Director of Engineering SamTrans |
| TransitAmerica Services, Inc. | Peninsula Corridor Joint Powers Board |
| 65 Cahill Street | P.O. Box 3006 |
| San Jose, CA 95110 | San Carlos, CA 94070-1306 |

Re:   **Notice of Violation and Intent to File Suit**
      **Under the Federal Water Pollution Control Act**

Dear Mr. Davis, Mr. Leon and Mr. Chao:

This firm represents the Ecological Rights Foundation ("ERF") in regard to violations of the Clean Water Act ("the Act") occurring at TransitAmerica Services, Inc.'s ("TransitAmerica") railcar maintenance facility located at 7150/7250 Monterey Road, in Gilroy, California ("the Facility"). The parcel numbers for the Facility are as follows: 84113017, 84113023 and 84113022. The WDID number for the Facility is 3 43I016608. ERF is a non-profit public benefit corporation dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including Llagas Creek, the Pajaro River and the Monterey Bay. This letter is being sent to you as the responsible owners, officers or operators of the Facility. Unless otherwise noted, Dustin L. Davis, Carlos Leon, Stephen Chao, the Peninsula Corridor Joint Powers Board, and TransitAmerica Services, Inc. shall hereinafter be collectively referred to as "TransitAmerica."

Notice of Violation and Intent To File Suit
May 13, 2015
Page 2 of 17

    This letter addresses TransitAmerica's unlawful discharges of pollutants from the Facility into the city of Gilroy's Municipal Separate Storm Sewer System, which conveys that water into Llagas Creek, which flows into the Pajaro River, and ultimately Monterey Bay.  TransitAmerica is in ongoing violation of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq*., and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 92-12-DWQ, and Order No. 97-03-DWQ ("Permit").[1] Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of its intent to file suit.  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. § 135.2.

    As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Dustin L. Davis, Carlos Leon, Stephen Chao, the Peninsula Corridor Joint Powers Board, and TransitAmerica Services, Inc. are hereby placed on formal notice by ERF that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, ERF intends to file suit in federal court against Dustin L. Davis, Carlos Leon, Stephen Chao, the Peninsula Corridor Joint Powers Board, and TransitAmerica Services, Inc. under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)) for violations of the Clean Water Act and the Permit.  These violations are described more fully below.

## I.    Background.

### A.  The Clean Water Act.

    Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges. *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984).  Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutant by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements.  33 U.S.C. § 1311(a).  The Permit requirement extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ."  40 C.F.R. § 122.30(a).

    The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand

---

[1] On April 1, 2014, the State Board reissued the Permit, continuing its mandate that industrial facilities implement the best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT") and, in addition, establishing numeric action levels mandating additional pollution control efforts. State Board Order 2014-0057-DWQ.  The new permit, however, does not go into effect until July 1, 2015.  Until that time, the current Permit remains in full force and effect.

discharged into water.  33 U.S.C. § 1362(6).  A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14). "Navigable waters" means "the waters of the United States" and includes, for example, traditionally navigable waters and tributaries to such waters.  33 U.S.C. § 1362(7); 40 C.F.R. § 122.2(c) and (e).  Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States.  *U.S. v. Moses*, 496 F.3d 984, 990-991 (9th Cir. Aug. 3, 2007), *rehearing en banc denied* (2007).

ERF is informed and believes, and thereupon alleges, that TransitAmerica has discharged, and continues to discharge, pollutants from the Facility to waters of the United States, through point sources, in violation of the terms of the Permit, every day that there has been or will be any measurable discharge of storm water from the Facility since June 18, 2001 or earlier.[2]  Each discharge, on each separate day, is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These unlawful discharges are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, TransitAmerica is subject to penalties for violations of the Act since May 13, 2010.

## B.  TransitAmerica's Facility, Water Quality Standards, and EPA Benchmarks

The Facility is located at 7150 Monterey Road in the City of Gilroy and discharges into the City of Gilroy's Municipal Separate Storm Sewer System, which conveys that water into Llagas Creek, which flows into the Pajaro River, and ultimately Monterey Bay.  The Facility falls under Standard Industrial Classification (SIC) Code 4111 (Passenger Rail Service). TransitAmerica submitted a Notice of Intent (NOI) to discharge under the General Permit on June 18, 2001.  ERF's investigations into the industrial activities at TransitAmerica's approximately 4-acre Facility indicate that the Facility is used to store passenger and freight railcars, heavy machinery, waste oils, and scrap metals, including copper, steel and aluminum. Moreover, the Facility is used to service, fuel, wash, dismantle and maintain rail engine cars. TransitAmerica collects and discharges storm water from the Facility through at least six (6) discharge points into the city of Gilroy's Municipal Separate Storm Sewer System, which conveys that water into Llagas Creek, which flows into the Pajaro River, and ultimately Monterey Bay.  Llagas Creek, the Pajaro River and Monterey Bay are waters of the United States within the meaning of the Clean Water Act.

The Central Coast Regional Water Quality Control Board ("Regional Board") has established water quality standards for the Pajaro River and the Monterey Bay in the "Water Quality Control Plan for the Central Coast Basin" ("Basin Plan").  The Basin Plan incorporates in its entirety the State Board's "Water Quality Control Plan for Ocean Waters of California" ("Ocean Plan").  The Ocean Plan "sets forth limits or levels of water quality characteristics for

---

[2] Storm water is discharged in measurable amounts from the Facility on dates that include, but are not limited to, when 0.1 inches of rain falls on the Facility.

Notice of Violation and Intent To File Suit
May 13, 2015
Page 4 of 17

ocean waters to ensure the reasonable protection of beneficial uses and the prevention of
nuisance.  The discharge of waste shall not cause violation of these objectives."  Ocean Plan, at
4.  The Ocean Plan limits the concentration of organic materials in marine sediment to levels that
would not degrade marine life.  *Id*. at 6.  The Basin Plan establishes ocean water quality
objectives, including that dissolved oxygen is not to be less than 7.0 mg/l and pH is between 7.0
- 8.5 s.u.  Basin Plan, at III-2.  It also establishes that toxic metal concentrations in marine
habitats shall not exceed: Cu – 0.01 mg/L; Pb – 0.01 mg/L; Hg – 0.0001 mg/L; Ni – 0.002 mg/L;
and, Zn – 0.02 mg/L.  *Id.* at III-12.

The Basin Plan provides maximum contaminant levels (MCLs) for organic
concentrations and inorganic and fluoride concentrations, not to be exceeded in domestic or
municipal supply.  *Id*. at III-6 - III-7.  It requires that water designated for use as domestic or
municipal supply shall not exceed the following maximum contaminant levels: Aluminum – 1.0
mg/L; Arsenic - 0.05 mg/L; Lead - 0.05 mg/L; and Mercury - 0.002 mg/L.  *Id*. at III-7.

The EPA has also issued a recommended water quality criterion for aluminum for
freshwater aquatic life protection of 0.087 mg/L.  In addition, the EPA has established a
secondary MCL, consumer acceptance limit for Aluminum - 0.05 mg/L to 0.2 mg/L, and for
Zinc - 5.0 mg/L.  *See* http://www.epa.gov/safewater/ mcl.html.  Finally, the California
Department of Health Services has established the following MCL, consumer acceptance levels:
Aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); Chromium – 0.5 mg/L (primary);
Copper – 1.0 mg/L (secondary); Iron – 0.3 mg/L; and Zinc – 5.0 mg/L.  *See* California Code of
Regulations, title 22, §§ 64431, 64449.

The California Toxics Rule ("CTR"), issued by the EPA in 2000, establishes numeric
receiving water limits for certain toxic pollutants in California surface waters.  40 C.F.R. §
131.38.  The CTR establishes the following numeric limits for freshwater surface waters:
Arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L; Chromium (III) – 0.550 mg/L
(maximum concentration); Copper – 0.013 mg/L (maximum concentration); and Lead – 0.065
mg/L (maximum concentration).

The Regional Board has identified waters of the Central Coast, such as the Pajaro River,
as failing to meet water quality standards for pollutant/stressors such as unknown toxicity,
numerous pesticides, and mercury.[3]  Discharges of pollutants into a surface water body may be
deemed a "contribution" to an exceedance of the CTR, an applicable water quality standard, and
may indicate a failure on the part of a discharger to implement adequate storm water pollution
control measures.  *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918
(9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037
at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger covered by the Permit was "subject
to effluent limitations as to certain pollutants, including zinc, lead, copper, aluminum and lead"
under the CTR).

---

[3] *See* http://www.waterboards.ca.gov/water_issues/programs/tmdl/2010state_ir_reports/category5_report.shtml.

Notice of Violation and Intent To File Suit
May 13, 2015
Page 5 of 17

Under the Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").[4]  The following benchmarks have been established for pollutants discharged by TransitAmerica: Total Suspended Solids – 100 mg/L; Zinc – 0.117 mg/L; Copper – 0.0636 mg/L; and Lead – 0.0816 mg/L.  The State Water Quality Control Board has also proposed adding a benchmark level for Specific Conductance of 200 μmhos/cm.  Additional EPA benchmark levels have been established for other parameters that ERF believes are being discharged from the Facility, including but not limited to: Oil & Grease – 15.0 mg/L, Nickel – 1.417 mg/L, Magnesium – 0.0636 mg/L, Chemical Oxygen Demand – 120 mg/L, Cadmium – 0.0159 mg/L, Mercury – 0.0024 mg/L, Selenium – 0.2385 mg/L, and Silver – 0.0318 mg/L.

The Permit requires TransitAmerica to analyze storm water samples for Total Suspended Solids (TSS), pH, Specific Conductance (SC), and Total Organic Carbon (TOC) or Oil and Grease (O&G).  Permit, Section B(5)(c)(i).

## II.     TransitAmerica's Violations of the Permit.

Based on its review of available public documents, ERF is informed and believes that TransitAmerica is in ongoing violation of both the substantive and procedural requirements of the Clean Water Act, as discussed in detail below.

### A.  TransitAmerica Has Discharged Storm Water Containing Pollutants in Violation of Effluent Limitation B(3), Discharge Prohibition A(2), and Receiving Water Limitations C(1) and C(2).

The Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  Permit, Section A(8).  Conventional pollutants are Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand, and Fecal Coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the Permit provides:  "Except as allowed in Special Conditions (D.1.) of this Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited.  Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."  Special Conditions D(1) of the Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water

---

[4] The Benchmark Values can be found at: http://www.epa.gov/npdes/pubs/msgp2008_finalpermit.pdf, and http://cwea.org/p3s/documents/multi-sectorrev.pdf.  (Last accessed on April 27, 2015).

Notice of Violation and Intent To File Suit
May 13, 2015
Page 6 of 17

discharge.  Discharge Prohibition A(2) provides: "Storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance."

Receiving Water Limitation C(1) of the Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

TransitAmerica has discharged and continues to discharge storm water at unacceptable levels of Total Suspended Solids, Zinc, Copper, Lead, and Specific Conductance in violation of the Permit.  These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A. TransitAmerica's Annual Reports and Sampling and Analysis Results confirm discharges of specific pollutants in violation of the Permit provisions listed above.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Effluent Limitation B(3), Discharge Prohibition A(2) and/or Receiving Water Limitations C(1) and C(2) of the Permit:

**1.     Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 2/16/2011 | Storm Drain 1 | TSS | 280 mg/L | 100 mg/L |
| 2/16/2011 | Storm Drain 4 | TSS | 160 mg/L | 100 mg/L |
| 3/18/2011 | Storm Drain 1 | TSS | 870 mg/L | 100 mg/L |
| 2/16/2011 | Storm Drain 3 | TSS | 670 mg/L | 100 mg/L |
| 2/29/2012 | Storm Drain 2 | TSS | 110 mg/L | 100 mg/L |
| 3/20/2013 | Storm Drain 1 | TSS | 843 mg/L | 100 mg/L |
| 3/20/2013 | Storm Drain 2 | TSS | 506 mg/L | 100 mg/L |

Notice of Violation and Intent To File Suit
May 13, 2015
Page 7 of 17

| | | | | |
|---|---|---|---|---|
| 3/20/2013 | Storm Drain 3 | TSS | 463 mg/L | 100 mg/L |
| 2/6/2014 | Storm Drain 2 | TSS | 110 mg/L | 100 mg/L |

**2.**     **Discharge of Storm Water Containing Zinc (Zn) at Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 2/16/2011 | Storm Drain 1 | Zn | 0.25 mg/L | 0.117 mg/L |
| 3/18/2011 | Storm Drain 1 | Zn | 9.1 mg/L | 0.117 mg/L |
| 2/29/2011 | Storm Drain 2 | Zn | 0.37 mg/L | 0.117 mg/L |
| 2/29/2012 | Storm Drain 3 | Zn | 0.32 mg/L | 0.117 mg/L |
| 2/29/2012 | Storm Drain 4 | Zn | 0.32 mg/L | 0.117 mg/L |
| 11/28/2012 | Storm Drain 1 | Zn | 0.211 mg/L | 0.117 mg/L |
| 11/28/2012 | Storm Drain 2 | Zn | 0.217 mg/L | 0.117 mg/L |
| 11/28/2012 | Storm Drain 3 | Zn | 0.211 mg/L | 0.117 mg/L |
| 3/20/2012 | Storm Drain 1 | Zn | 0.165 mg/L | 0.117 mg/L |
| 3/20/2012 | Storm Drain 2 | Zn | 0.129 mg/L | 0.117 mg/L |
| 3/20/2012 | Storm Drain 3 | Zn | 0.18 mg/L | 0.117 mg/L |

Notice of Violation and Intent To File Suit
May 13, 2015
Page 8 of 17

3.      **Discharge of Storm Water Containing Copper (Cu) at Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 3/18/2011 | Storm Drain 1 | Cu | 0.14 mg/L | 0.0636 mg/L |
| 3/20/2013 | Storm Drain 1 | Cu | 0.0668 mg/L | 0.0636 mg/L |

4.      **Discharge of Storm Water Containing Lead (Pb) at Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 3/18/2011 | Storm Drain 1 | Pb | 0.19 mg/L | 0.0816 mg/L |

5.      **Discharge of Storm Water Containing Specific Conductance (SC) at Concentrations in Excess of Proposed Benchmark.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 3/20/2013 | Storm Drain 1 | SC | 539 µmhos/cm | 200 µmhos/cm |
| 3/20/2013 | Storm Drain 2 | SC | 573 µmhos/cm | 200 µmhos/cm |
| 3/20/2013 | Storm Drain 3 | SC | 539 µmhos/cm | 200 µmhos/cm |

The above sample results demonstrate violations of Effluent Limitation B(3). ERF's investigations, including a review of TransitAmerica's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's Benchmark values and the State Board's proposed benchmark level for Specific Conductivity, indicates that TransitAmerica has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids, Zinc, Copper, Lead, and Specific Conductance in violation of Effluent Limitation B(3) of the Permit. TransitAmerica was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations. Thus, TransitAmerica is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

The above sample data demonstrates that TransitAmerica's discharges  adversely impact human health or the environment in violation of Receiving Water Limitation C(1) of the Permit,

Notice of Violation and Intent To File Suit
May 13, 2015
Page 9 of 17

and that these discharges cause or threaten to cause pollution, contamination or nuisance in violation of Discharge Prohibition A(2). The above samples may also constitute violations of Receiving Water Limitation C(2) of the Permit, with respect to the discharge of parameters for which TransitAmerica has failed to undertake testing and which cause or contribute to an exceedance of applicable water quality standards, including CTR limits.

ERF is informed and believes that TransitAmerica has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least May 13, 2010. ERF alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since May 13, 2010, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which ERF alleges that TransitAmerica has discharged storm water containing impermissible levels of Total Suspended Solids, Zinc, Copper, Lead, and Specific Conductance in violation Effluent Limitation B(3), Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the Permit and the Act. Each violation in excess of receiving water limitations and discharge prohibitions is likewise a separate and distinct violation of the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, TransitAmerica is subject to penalties for violations of the Permit and the Act since May 13, 2010.

**B.    TransitAmerica Has Failed to Implement BAT and BCT**.

Effluent Limitation B(3) of the Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. Permit, Section A(8). ERF's investigations, and the Facility's exceedances of EPA benchmarks explained above, indicate that TransitAmerica has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids, Zinc, Copper, Lead, Specific Conductance and other unmonitored pollutants in violation of Effluent Limitation B(3) of the Permit.

To meet the BAT/BCT requirement of the Permit, TransitAmerica must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility. Based on the limited information available regarding the internal structure of the Facility, ERF believes that at a minimum TransitAmerica must improve its housekeeping practices, store materials that act as pollutant sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether. TransitAmerica has failed to adequately implement such measures.

Notice of Violation and Intent To File Suit
May 13, 2015
Page 10 of 17

TransitAmerica was required to have implemented BAT and BCT by no later than
October 1, 1992. Therefore, TransitAmerica has been in continuous violation of the BAT and
BCT requirements every day since October 1, 1992, and will continue to be in violation every
day that it fails to implement BAT and BCT. TransitAmerica is subject to penalties for
violations of the Permit and the Act occurring since May 13, 2010.

     **C.**    **TransitAmerica Has Failed to Implement an Adequate Monitoring &
        Reporting Program.**

Section B of the Permit requires that dischargers develop and implement an adequate
Monitoring and Reporting Program by no later than October 1, 1992 or the start of operations.
Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual
observations of non-storm water and storm water discharges from the Facility and to record and
report such observations to the Regional Board. Section B(5)(a) of the Permit requires that
dischargers "shall collect storm water samples during the first hour of discharge from (1) the first
storm event of the wet season, and (2) at least one other storm event in the wet season. All storm
water discharge locations shall be sampled." Section B(5)(c)(i) further requires that the samples
shall be analyzed for Total Suspended Solids, pH, Specific Conductance, and Total Organic
Carbon. Oil and Grease may be substituted for Total Organic Carbon. Section B(5)(c)(ii) of the
Permit further requires dischargers to analyze samples for all "[t]oxic chemicals and other
pollutants that are likely to be present in storm water discharges in significant quantities."
Section B(10) of the Permit provides that "Facility operators shall explain how the Facility's
monitoring program will satisfy the monitoring program objectives of [Permit] Section B.2."

Based on their investigations, ERF is informed and believes that TransitAmerica has
failed to develop and implement an adequate Monitoring & Reporting Program.

As an initial matter, based on its review of publicly available documents, ERF is
informed and believes that TransitAmerica has failed to collect storm water samples during at
least two qualifying storms events, as defined by the Permit, during at least three of the past five
Wet Seasons (2010-2011, 2012-2013, 2013-2014). Second, based on its review of publicly
available documents, ERF is informed and believes that TransitAmerica has failed to employ
adequate testing methods and detection limits in violation of the Permit for the past five wet
seasons. Further, TransitAmerica has failed to conduct the monthly visual monitoring of storm
water discharges and the quarterly visual observations of unauthorized non-storm water
discharges required under the Permit during at least three of the past five Wet Seasons. Finally,
based on its review of publicly available documents, ERF is informed and believes that
TransitAmerica has failed to analyze samples for other pollutants that are likely to be present in
significant quantities in the storm water discharged from the Facility including: Oil & Grease –
15.0 mg/L, Nickel – 1.417 mg/L, Magnesium – 0.0636 mg/L, Chemical Oxygen Demand – 120
mg/L, Cadmium – 0.0159 mg/L, Mercury – 0.0024 mg/L, Selenium – 0.2385 mg/L, and Silver –
0.0318 mg/L.

Each of these failures constitutes a separate and ongoing violation of the Permit and the
Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions

Notice of Violation and Intent To File Suit
May 13, 2015
Page 11 of 17

brought pursuant to the Clean Water Act, TransitAmerica is subject to penalties for violations of the Permit and the Act since May 13, 2010.  These violations are set forth in greater detail below.

**1.**    **TransitAmerica Has Failed to Collect Qualifying Storm Water Samples During at Least Two Rain Events During Three of The Last Five Wet Seasons.**

Based on its review of publicly available documents, ERF is informed and believes that TransitAmerica has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during three of the past five Wet Seasons, as required by the Permit.  This is so, even though there were many qualifying storm events from which to sample (discussed further below).

TransitAmerica reported in four of the past five Wet Seasons (i.e., 2010-2011; 2011-2012; 2012-2013; 2013-2014 Wet Seasons), that the Facility sampled the first qualifying storm event of the season, when in fact it did not sample the first storm of the season during those four Wet Seasons.  For example, TransitAmerica reported in its 2011-2012 Annual Report that it sampled the first qualifying storm event of the Wet Season, but TransitAmerica's first sample is from February 29, 2012.  Based upon its review of publicly available rainfall data, ERF is informed and believes that the first qualifying storm event of the 2011-2012 Wet Season occurred as early as October 5, 2011, when 0.6" of rain fell on the Facility.  These failures to adequately monitor storm water discharges constitutes separate and ongoing violations of the Permit and the Act.

**2.**    **TransitAmerica's Failure to Employ Adequate Testing Methods and Detection Limits in Violation of the Permit Since May 13, 2010.**

TransitAmerica is in violation of the Permit's requirement that the detection limits used in laboratory analyses of pollutant concentrations present in storm water discharged from the Facility be "adequate to satisfy the objectives of the monitoring program."  Permit Section B(10)(a)(iii).  In every single annual report filed by TransitAmerica, the detection limits employed by the laboratory utilized by TransitAmerica to analyze the concentration of the pollutants present in the storm water discharged from its Facility did not comply with these Permit requirements.

Specifically, the detection limits TransitAmerica applied over past four Wet Seasons have differed dramatically every year leading to inaccurate or unreliable sample results that failed to meet the standard set forth in Section B(10)(a)(iii).  For example, the detection limit applied by TransitAmerica for Lead in 2010, 2011, 2012, 2013 and 2014 was 0.0023 mg/L, 0.005 mg/L, 0.1 mg/L, and 0.002 mg/L respectively.  These are just a few of many examples of TransitAmerica's failure to adequately test the presence and concentration of pollutants at their storm water discharge points.  TransitAmerica is in violation of the Permit for failing to employ laboratory test methods that are adequate to, among other things, "ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and

Notice of Violation and Intent To File Suit
May 13, 2015
Page 12 of 17

Receiving Water Limitations specified in this Permit." Permit, Section B(2)(a) ("Monitoring Program Objectives").

ERF is informed and believes that publicly available documents demonstrate TransitAmerica's consistent and ongoing failure to implement an adequate Monitoring and Reporting Program in violation of Section B of the Permit. Accordingly, consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, TransitAmerica is subject to penalties for these violations of the Permit and the Act since May 13, 2010.

### 3.      TransitAmerica Has Failed to Conduct Monthly Wet Season Observations of Storm Water Discharges As Required by the Permit.

The Permit requires dischargers to "visually observe storm water discharges from one storm event per month during the Wet Season (October 1 – May 30)." Permit, Section B(4)(a). As evidenced by the entries on Form 4 Monthly Visual Observations contained in TransitAmerica's Annual Reports for three of the last five Wet Seasons, ERF is informed and believes that TransitAmerica has failed to comply with this requirement of the Permit.

Specifically, TransitAmerica failed to conduct monthly visual observations of discharges from qualifying storm events for all months during three of the past five Wet Seasons (i.e 2010-2011, 2011-2012, and 2012-2013) as required by the Permit. TransitAmerica either completely failed to document visual observations at all, or documented its visual observations of storm water that discharged during non-qualifying storm events during three of the past five Wet Seasons. However, based on publicly available rainfall data, ERF is informed and believes that there were many qualifying storm events during each of these Wet Seasons that TransitAmerica could have observed.

For example, TransitAmerica reported in its 2011-2012 Annual Report that, except for the months of February, March, and April it did not observe a discharge or there was no rain during the entire Wet Season. Based on its investigation of publicly available rainfall data, ERF is informed and believes that this could not be possible because there were numerous significant rainfall events during those months. *See* Attachment A. TransitAmerica's failure to conduct this required monthly Wet Season visual monitoring extends back to at least May 13, 2010, and has caused and continues to cause multiple, separate and ongoing violations of the Permit and the Act.

### 4.      TransitAmerica's Failure to Analyze Storm Water Samples for All Required Constituents.

The Permit requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." Permit Section B(5)(c)(ii). ERF is informed and believes that TransitAmerica has violated the Permit by failing to analyze samples for pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility during four of the past five Wet

Notice of Violation and Intent To File Suit
May 13, 2015
Page 13 of 17

Seasons (i.e. 2009-2010, 2010-2011, 2011-2012, 2013-2014) including: Oil & Grease – 15.0 mg/L, Nickel – 1.417 mg/L, Magnesium – 0.0636 mg/L, Chemical Oxygen Demand – 120 mg/L, Cadmium – 0.0159 mg/L, Mercury – 0.0024 mg/L, Selenium – 0.2385 mg/L, and Silver – 0.0318 mg/L.

Each failure to sample for all required constituents is a separate and distinct violation of the Permit and Clean Water Act.  Accordingly, TransitAmerica is subject to penalties for these violations of the Permit and the Act since May 13, 2010.

### D.  TransitAmerica Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.

Section A(1) and Provision E(2) of the Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.  Section A(1) and Provision E(2) require dischargers who submitted an NOI pursuant to the Permit to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 9, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the Facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges.  Permit, Section A(2).  The SWPPP must also include BMPs that achieve BAT and BCT.  Effluent Limitation B(3).

The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Permit, Section A(3)); a site map showing the Facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (Permit, Section A(4)); a list of significant materials handled and stored at the site (Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective.  Permit, Section A(7), (8).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary.  Permit, Section A(9),(10).  Receiving Water Limitation C(3) of the Permit requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce

Notice of Violation and Intent To File Suit
May 13, 2015
Page 14 of 17

the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

ERF's investigations and reviews of publicly available documents regarding conditions at the Facility indicate that TransitAmerica has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above.  TransitAmerica has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary.  Accordingly, TransitAmerica has been in continuous violation of Section A(1) and Provision E(2) of the Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP.  TransitAmerica is subject to penalties for violations of the Permit and the Act occurring since May 13, 2010.

     **E.**     **TransitAmerica Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.

The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Receiving Water Limitation C(4)(a).  Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.  *See also* Provision E(6).  Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, TransitAmerica is discharging elevated levels of Total Suspended Solids, Zinc, Copper, Lead, Specific Conductance, and other unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards.  For each of these pollutant exceedances, TransitAmerica was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on ERF's review of available documents, TransitAmerica was aware of high levels of these pollutants long before May 13, 2010.  TransitAmerica has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the Permit every day since May 13, 2010, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs.  TransitAmerica is subject to penalties for violations of the Permit and the Act occurring since May 13, 2010.

**F.      TransitAmerica Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board.  The Annual Report must be signed and certified by an appropriate corporate officer.  Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the Permit.  *See also* Permit, Sections C(9) and (10) and B(14).

ERF's investigations indicate that TransitAmerica has submitted incomplete Annual Reports and purported to comply with the Permit despite significant noncompliance at the Facility.  For example, TransitAmerica reported in four Annual Reports filed for the past four Wet Seasons (i.e., 2010-2011, 2011-2012, 2012-2013 and 2013-2014) that it observed storm water discharges occurring during the first storm of those Wet Seasons.  However, as discussed above, based on ERF's review of publicly available rainfall data, ERF believes this is incorrect.

Further, TransitAmerica failed to sample from qualifying storm events in three of the last five Wet Seasons in violation of the Permit.  For example, in the 2010-2011 Annual Report TransitAmerica reported that it sampled from a storm event on February 16, 2011.  However based on publicly available rainfall data ERF, is informed and believes that it the storm that occurred at the Facility on February 16, 2011 was not a qualifying storm event because 0.23 inches of rain fell on the Facility on February 14, 2011. Thus, the February 14th storm event very likely rendered any storm occurring for three days afterwards non-qualifying under the Permit.  These are but a few examples of how TransitAmerica has failed to file completely true and accurate reports.  As indicated above, TransitAmerica has failed to comply with the Permit and the Act consistently for the past five years; therefore, TransitAmerica violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time TransitAmerica submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past five years.  ERF hereby notifies TransitAmerica that it intends to sue regarding all such violations.  TransitAmerica's failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act.  TransitAmerica is subject to penalties for violations of Section (C) of the Permit and the Act occurring since May 13, 2010.

**IV.    Persons Responsible for the Violations.**

ERF puts Dustin L. Davis, Carlos Leon, Stephen Chao, the Peninsula Corridor Joint Powers Board, and TransitAmerica Services, Inc. on notice that they are the persons and entities responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, ERF puts Dustin L. Davis, Carlos Leon, Stephen Chao, the Peninsula Corridor Joint Powers Board, and TransitAmerica Services, Inc. on formal notice that it intends to include those persons in this action.

**V.     Name and Address of Noticing Parties.**

The name, address and telephone number of each of the noticing parties is as follows:

Notice of Violation and Intent To File Suit
May 13, 2015
Page 16 of 17

Ecological Rights Foundation, James Lamport, Executive Director, 867 B Redwood Drive, Garberville, California 95542.

## VI.    Counsel.

ERF has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
Megan Truxillo
John J. Prager
LAW OFFICES OF ANDREW L. PACKARD
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
Tel. (707) 763-7227
Email: Andrew@PackardLawOffices.com

## VII.    Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Dustin L. Davis, Carlos Leon, Stephen Chao, the Peninsula Corridor Joint Powers Board, and TransitAmerica Services, Inc. to a penalty of up to $37,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, ERF will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

ERF believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Dustin L. Davis, Carlos Leon, Stephen Chao, the Peninsula Corridor Joint Powers Board, and TransitAmerica Services, Inc. and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Andrew L. Packard
Counsel for
Ecological Rights Foundation

Notice of Violation and Intent To File Suit
May 13, 2015
Page 17 of 17

## <u>SERVICE LIST</u>

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Thomas Howard, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Kenneth A. Harris, Jr., Executive Officer
Regional Water Quality Control Board
Central Coast Region
895 Aerovista Place, Suite 101
San Luis Obispo, CA 93401-7906

**ATTACHMENT A**
**Notice of Intent to File Suit, TransitAmerica Services, Inc.**
**Significant Rain Events,\* May 13, 2010 – May 13, 2015**

| | | | |
|---|---|---|---|
| May 25, 2010 | March 23, 2011 | April 12, 2012 | February 8, 2014 |
| May 27, 2010 | March 24, 2011 | April 13, 2012 | February 9, 2014 |
| October 17, 2010 | March 25, 2011 | April 15, 2012 | February 26, 2014 |
| October 22, 2010 | March 26, 2011 | October 22, 2012 | February 27, 2014 |
| October 23, 2010 | April 8, 2001 | October 23, 2012 | February 28, 2014 |
| October 24, 2010 | May 15, 2011 | November 16, 2012 | March 1, 2014 |
| November 19, 2010 | May 16, 2011 | November 17, 2012 | March 3, 2014 |
| November 20, 2010 | May 17, 2011 | November 18, 2012 | March 26, 2014 |
| November 21, 2010 | May 18, 2011 | November 28, 2012 | March 29, 2014 |
| November 23, 2010 | June 4, 2011 | November 29, 2012 | March 31, 2014 |
| November 27, 2010 | June 28, 2011 | November 30, 2012 | April 1, 2014 |
| December 5, 2010 | October 5, 2011 | December 2, 2012 | April 4, 2014 |
| December 14, 2010 | November 4, 2011 | December 3, 2012 | April 25, 2014 |
| December 17, 2010 | November 5, 2011 | December 5, 2012 | September 25, 2014 |
| December 18, 2010 | November 11, 2011 | December 15, 2012 | October 25, 2014 |
| December 19, 2010 | November 18, 2011 | December 17, 2012 | October 31, 2014 |
| December 21, 2010 | November 19, 2011 | December 22, 2012 | November 1, 2014 |
| December 22, 2010 | November 20, 2011 | December 23, 2012 | November 13, 2014 |
| December 25, 2010 | January 19, 2012 | December 25, 2012 | November 19, 2014 |
| December 28, 2010 | January 20, 2012 | December 26, 2012 | November 29, 2014 |
| December 29, 2010 | January 21, 2012 | December 29, 2012 | November 30, 2014 |
| January 1, 2011 | January 22, 2012 | January 5, 2013 | December 1, 2014 |
| January 2, 2011 | January 23, 2012 | January 6, 2013 | December 2, 2014 |
| January 30, 2011 | February 7, 2012 | January 24, 2013 | December 3, 2014 |
| February 14, 2011 | February 13, 2012 | February 16, 2013 | December 5, 2014 |
| February 16, 2011 | February 15, 2012 | March 6, 2013 | December 11, 2014 |
| February 17, 2011 | February 29, 2012 | March 7, 2013 | December 12, 2014 |
| February 18, 2011 | March 1, 2012 | April 1, 2013 | December 16, 2014 |
| February 19, 2011 | March 16, 2012 | April 4, 2013 | December 17, 2014 |
| February 24, 2011 | March 17, 2012 | October 29, 2013 | December 19, 2014 |
| February 25, 2011 | March 18, 2012 | November 19, 2013 | December 20, 2014 |
| February 26, 2011 | March 24, 2012 | November 20, 2013 | February 6, 2015 |
| March 13, 2011 | March 25, 2012 | December 6, 2013 | February 7, 2015 |
| March 16, 2011 | March 27, 2012 | December 7, 2013 | February 8, 2015 |
| March 18, 2011 | March 28, 2012 | January 30, 2014 | March 11, 2015 |
| March 19, 2011 | March 31, 2012 | February 2, 2014 | April 7, 2015 |
| March 20, 2011 | April 10, 2012 | February 6, 2014 | April 25, 2015 |
| March 21, 2011 | April 11, 2012 | February 7, 2014 | |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.